UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Zeolla, et al.

v.

Southern New Hampshire University

Case No. 1:25-cv-00541-JL-TSM
Opinion No. 2026 DNH 166

# MEMORANDUM ORDER

This case involves the duties regarding information privacy, lying in tort, contract, and statutory law, owed by a university to students and applicants. Plaintiffs Tina Zeolla, Kerstin Kellogg, Ashley Wright, and Crystal Loftus bring this putative class action against Southern New Hampshire University, alleging that the university improperly disclosed students' and prospective students' personal information and educational records to third parties through tracking technologies embedded in its websites and online student portal. The plaintiffs, who seek to represent a nationwide class and subclasses of affected individuals from California, Massachusetts, and Michigan, assert 15 claims arising out of SNHU's alleged disclosure of their personal information through third-party tracking technologies, including federal and state wiretapping and privacy claims, state consumer-protection and computer-fraud claims, and common-law claims for intrusion upon seclusion, breach of contract, unjust enrichment, and negligence. SNHU moves to dismiss the complaint for failure to state a claim, arguing that the plaintiffs consented to the allegedly improper disclosures and, independently, that the complaint fails to plead essential elements of each count.

This court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1367 (supplemental jurisdiction). After reviewing the parties' submissions and hearing oral argument, the court partially grants and partially denies SNHU's motion to dismiss. The motion is granted as to the plaintiffs' claim under the federal Electronic Communications Privacy Act because SNHU's status as a party to the communications exempts it from liability and the plaintiffs fail to allege sufficient facts to invoke the crime-fraud exception. The motion is also granted as to the plaintiffs' claims under California's Unfair Competition Law and Computer and Comprehensive Computer Data Access and Fraud Act for lack of statutory standing. As to the remaining counts and complaint as a whole, the motion to dismiss is denied for the reasons discussed below.

## I. Legal standard

To state a claim for relief, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Martinez v. Petrenko*, 792 F.3d 173, 179 (1st Cir. 2015). This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013). In ruling on a motion brought under Rule 12(b)(6), the court "accept[s] as true all well-pleaded facts in the complaint and make[s] all reasonable inferences in the plaintiff's favor." *Martino v. Forward Air, Inc.*, 609 F.3d 1, 2 (1st Cir. 2010).

***Permissible record.*** While the court "is generally limited to considering facts and documents that are part of the complaint, it may also consider documents incorporated by

reference in the complaint, matters of public record, and other matters susceptible to judicial notice." *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020) (citations omitted) (cleaned up); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). There are also certain "narrow exceptions" under which "some extrinsic documents may be considered without converting a motion to dismiss into a motion for summary judgment." *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013). "These exceptions include 'documents the authenticity of which are not disputed by the parties; official public records; documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'" *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

Here, in support of its motion to dismiss, SNHU includes a declaration from its in-house counsel that appends three SNHU policies: (1) SNHU's FERPA[1] Student Right to Privacy (the "FERPA Policy"); (2) SNHU's Privacy Policy (the "Privacy Policy"); and (3) the SNHU Text Service – SMS Terms and Conditions (the "SMS Terms and Conditions").[2] The declaration attests to the currentness and completeness of the appended policies, describes where they are located on SNHU's web properties, and provides screenshots from internal SNHU records that purportedly show when each of the named plaintiffs agreed to the SMS Terms & Conditions by completing a "Get Info"

[1] "FERPA" refers to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.
[2] Doc. nos. 31-2, 31-3, 31-4, and 31-5.

form to initiate their application process with the school.[3] SNHU argues that the court should consider these documents in deciding the motion to dismiss.

The court agrees and considers both the FERPA Policy and the Privacy Policy. The plaintiffs' claims turn on whether SNHU improperly disclosed their data in violation of FERPA and the school's representations concerning the protection of student information. Those representations are set forth in the FERPA Policy and the Privacy Policy, making those documents integral to the plaintiffs' claims and fairly considered on a Rule 12(b) motion. *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When… a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b).").

The court rejects SNHU's argument as to the declaration from SNHU's counsel and the SMS Terms & Conditions because neither fit into any of the "narrow exceptions" for extrinsic documents that may be considered without converting a motion to dismiss into a motion for summary judgment. *See Freeman*, 714 F.3d at 36. Indeed, SNHU does not invoke any of the aforementioned exceptions in arguing for consideration of these documents, contending instead that "[b]ecause [the] [p]laintiffs assert the existence of an 'agreement' or a 'contract' between themselves and SNHU, the [c]ourt may appropriately consider the contents of the agreement or contract (including their adoption or execution

[3] *See* doc. no. 31-2.

by [the] [p]laintiffs) on Rule 12, even though [the] [p]laintiffs seek to artfully omit those contents from the [c]omplaint."[4]

This argument suffers from at least two flaws. First, the contract claims rest on SNHU's "privacy representations."[5] Those privacy representations are set forth the FERPA Policy and Privacy Policy, not the SMS Terms & Conditions, which merely purports to incorporate the Privacy Policy by reference. The SMS Terms & Conditions is therefore not a document upon which the plaintiffs sue but rather a separate document selected by SNHU to support its defense. *See, e.g., Sonrai Sys., LLC v. Waste Conn., Inc.*, 658 F. Supp. 3d 604, 617 (N.D. Ill. 2023) (declining to consider declaration from a company employee regarding the plaintiff's receipt and execution of consent forms on Rule 12(b) motion because the plaintiff's complaint did not refer to the consent materials included in the declaration and the consent materials were not central to the plaintiff's claims); *see also Giles v. Sabert Corp.*, 2025 WL 274326, at *6 (N.D. Ill. Jan. 21, 2025) (reaching the same conclusion and adding that "the alleged consents do not appear to be central to [p]laintiffs' claims, rather they are central to [the defendant's] defenses").

Second, even if the court were to consider the SMS Terms & Conditions as independently central to the plaintiffs' claims, SNHU cites no authority for the proposition that the court may consider evidence of their "adoption or execution."[6] The First Circuit Court of Appeals' decision in *Beddall* stands for the limited proposition that

---

[4] Mot. to Dismiss (doc. no. 31-1) at 8 n.4.
[5] Compl. (doc. no. 28) ¶ 311.
[6] Mot. to Dismiss (doc. no. 31-1) at 8 n.4.

a district court may consider a document whose existence and authenticity are undisputed without converting a Rule 12(b)(6) motion into a Rule 56 motion. *See* 137 F.3d at 16-17. It says nothing about accepting evidence proffered by the defendant that the plaintiff agreed to the document's terms. That is exactly what SNHU offers here through its declaration from counsel, which contains, *inter alia*, screenshots from SNHU's internal records of what each plaintiff clicked and screenshots of current webpages alongside representations from counsel concerning her "understand[ing]" that those webpages looked materially similar in years past.[7] The plaintiffs here allege throughout the complaint they did not consent to SNHU's data-sharing practices, and the court will not consider SNHU's evidence disputing that factual issue at this preliminary stage. *See Rodi v. S. New England Sch. of L.*, 389 F.3d 5, 12 (1st Cir. 2004) ("[W]e may not consider at [the motion to dismiss] stage the array of affidavits and miscellaneous documents proffered by the parties."); *see also Raouf v. U.S. Dep't of State*, 702 F. Supp. 3d 19, 27 (D.N.H. 2023) (declining to consider declaration prepared by the office of the defendant's in-house counsel because "[t]he declaration is not a public record; it is not central to [the plaintiff's] claim; it is nowhere referred to in [the] complaint; and [the plaintiff] does not concede the declaration's authenticity").

## II. **Background**

SNHU is a private, nonprofit institution of higher education based in New Hampshire that enrolls 3,000 on-campus students and over 200,000 online students.[8]

---

[7] Dillon Decl. (doc. no. 31-2) ¶ 8.
[8] Compl. (doc. no. 28) ¶ 2.

SNHU operates a public-facing website (www.snhu.edu) through which prospective students can research academic programs, explore financial aid options, and apply for admission. It also operates a password-protected student portal (mySNHU) through which enrolled students may access the Brightspace academic platform containing course materials, grades, academic records, financial aid information, and other student services.

### A. SNHU's alleged use of tracking technologies

SNHU configured both its public-facing website and student portal with "tracking technologies" that collect and transmit information about users' interactions with those webpages to third-party advertising companies. These technologies include Google Analytics, the Meta Pixel, the TikTok Pixel, and the Snap Pixel, which permit website operators like SNHU to analyze user behavior and improve their targeted advertising efforts by deploying "tracking pixels" (snippets of computer code embedded in websites) to collect interaction information regarding the pages users' visit, links they select, searches they perform, and information they enter into online forms.[9] Other technologies, like Snap Conversions API, allow website operators to transmit information directly to the third-party company without the transmissions being visible through ordinary browser network activity via a "server-to-server integration."[10]

SNHU used these technologies to obtain analytics about website visitors, target existing and prospective students with advertisements, and identify prospective students with characteristics similar to those of its existing students. In so doing, SNHU

---

[9] *Id.* ¶¶ 66-73.
[10] *Id.* ¶ 109.

transmitted both information identifying individual users and information concerning their educational activities to Google, Meta, TikTok, and Snap. Specifically, SNHU allegedly disclosed website users' (1) full names; (2) personal and SNHU email addresses; (3) telephone numbers; (4) physical and mailing addresses; (5) gender identities and pronouns; (6) race and ethnicity; (7) employment and career status; (8) SNHU student identification numbers; (9) military affiliation or service status; (10) first-generation college student status; (11) financial aid application status; (12) degree programs and areas of study; (13) course enrollment information, including descriptions of courses in which students were enrolled; (14) course grades and cumulative GPAs; and (15) searches, queries, and other interactions with SNHU's websites, including their applications for admission and requests for academic information.[11] These transmissions also included users' IP addresses, browser and device information, cookies, and other unique identifiers that allowed the third-party companies to associate the information with particular individuals. Put differently, SNHU is alleged to have affirmatively configured tracking technologies to transmit information specific to its student population, including academic records and demographic information, in a manner that was not anonymized or de-identified.

Instances of these alleged disclosures are discernible by observing network traffic during interactions with SNHU's websites, and the complaint details several such observations. In one set of exemplar interactions, Google received a student's name,

[11] *Id.* ¶ 10.

contact information, demographic characteristics, student identification number, course enrollment information, GPA, and financial aid information when students accessed various pages within the password-protected "mySNHU" portal.[12] In another, Meta received information concerning a user's interactions with SNHU's online application process, including the user's email addresses and the fact that they had applied for admission.[13] These disclosures occurred contemporaneously with users' interactions with SNHU's websites, thus enabling the third-party companies to "intercept" information that they could use for their own commercial purposes like refining advertising profiles, improving advertising algorithms, and delivering targeted advertisements.

### B. Applicable SNHU policies

SNHU maintains two policies relevant to the plaintiffs' allegations:

***FERPA Policy.*** SNHU's FERPA Student Right to Privacy Policy provides that students generally have "[t]he right to provide written consent before [SNHU] discloses personally identifiable information" contained in their education records, subject to exceptions authorized by FERPA.[14] Those exceptions include disclosure without prior written consent to "school officials with legitimate educational interests," a category that includes university employees and third-party contractors retained to perform services on SNHU's behalf, such as attorneys, auditors, and collection agents. The FERPA Policy

---

[12] *Id.* ¶¶ 120-21.
[13] *Id.* ¶¶ 125-27.
[14] FERPA Policy (doc. no. 31-3) at 2.

further states that SNHU "does not disclose personally identifiable information contained in student education records, except as authorized by law."[15]

The FERPA Policy separately addresses "directory information," which it describes as information "generally not considered harmful or an invasion of privacy if released."[16] SNHU may disclose directory information to outside organizations without prior written consent. SNHU designates as directory information students' names, addresses, telephone numbers, email addresses, fields of study, anticipated program completion dates, class levels, degrees, honors and awards, participation in recognized activities and sports, certain athletic information, and most recently attended educational institutions. The FERPA Policy provides that SNHU "may disclose appropriately designated directory information without a student's consent, unless the student has advised SNHU to the contrary in accordance with established procedures," and establishes an opt-out procedure through which students may prohibit such disclosures without their prior written consent.[17]

***Privacy Policy.*** The Privacy Policy outlines "how [SNHU] and its various business units… collect, use, and safeguard information [SNHU] obtain[s] and hold[s] about" all users of SNHU's web properties.[18] It states that users "expressly consent" to the described uses of their information by accessing SNHU's online properties (including SNHU's "learning management system," i.e., "mySNHU" student portal) and

---

[15] *Id.*
[16] *Id.* at 3.
[17] *Id.* at 2-3.
[18] Privacy Policy (doc. no. 31-4) at 2.

"acknowledge" that their communications through those platforms "are not confidential."[19] It broadly defines the information SNHU "collects" to include academic records, personally identifiable information, and technical information concerning users' online activities, including browsing history, device information, Google Analytics identifiers, and other tracking data.[20]

In a section entitled "Automatic Collection through Cookies and Other Technologies," the Privacy Policy discloses that SNHU and third parties "like Google, Facebook or Amazon" may use cookies, web beacons, and other tracking technologies to collect information about users' activities across websites and online services.[21] Such information may include or be associated with personal information and may be used to "provide [users] with interest-based (behavioral) advertising or other targeted content."[22] The Policy adds that SNHU "do[es] not control" third-party tracking technologies and directs users to the third parties' respective privacy policies for additional information about how those companies "use and disclose" website users' information.[23] Elsewhere, the Policy states that SNHU "does not sell personal information to outside parties for their commercial use" but "may share information" with, inter alia, "third-party service providers" for things like "[m]arketing and analytics" and "[r]esearch insights."[24] The Policy explains that "[m]ost of [SNHU's] collection and processing of personal

---

[19] *Id.*
[20] *Id.* at 3.
[21] *Id.* at 3-4.
[22] *Id.* at 4-5.
[23] *Id.* at 4.
[24] *Id.* at 5.

information" is "necessary for the purposes of the legitimate interests pursued by SNHU" and identifies several such purposes, including institutional development and administration.[25]

The Privacy Policy twice directs current and former students to SNHU's separate FERPA Policy. First, in the preface, the Privacy Policy advises students to review the FERPA Policy for an outline of their "rights with respect to education records held by SNHU."[26] Second, after stating that student "directory information" may be disclosed as permitted by law, the Privacy Policy links to the FERPA Policy for "[m]ore information about student rights with respect to directory information."[27]

### C. **Procedural background**

The named plaintiffs—three students currently enrolled at SNHU and one who was enrolled with SNHU until December 2025—filed a consolidated complaint on behalf of all individuals who used SNHU's websites or applications and whose private information was allegedly disclosed to Google, Meta, Snap, TikTok, or other unauthorized third parties through tracking technologies. They also seek to represent subclasses of affected individuals in California, Michigan, and Massachusetts.

The plaintiffs allege that SNHU's disclosure of student information through the tracking technologies violated FERPA, 20 U.S.C. § 1232g, as well as the FERPA Policy detailing the school's implementation of that statute. In other words, the plaintiffs assert

---

[25] *Id.*
[26] *Id.* at 2.
[27] *Id.* at 6.

that SNHU's alleged disclosures violated both FERPA's confidentiality requirements and the school's representations concerning the protection of student information. The plaintiffs allege that they reasonably expected their personal information and educational records to remain confidential, particularly when accessing SNHU's password-protected student portal, and that SNHU neither adequately disclosed its use of the tracking technologies nor obtained their consent (written or otherwise) to the challenged disclosures. They contend that SNHU affirmatively configured its web properties with the tracking technologies in a manner that knowingly permitted third-party advertising companies to collect and use their information for commercial purposes, thus invading their privacy and causing, *inter alia*, emotional distress, a loss of control over their personal information, a diminishment in the value of that information, and loss of the benefit of their bargain with SNHU.

Based on these allegations, the plaintiffs assert 15 claims against SNHU on behalf of a nationwide class and the California, Massachusetts, and Michigan subclasses. They allege common-law invasion of privacy by intrusion upon seclusion (Count 1), violations of the federal Electronic Communications Privacy Act and the New Hampshire Wiretap Act (Counts 2 and 3); violations of the California Invasion of Privacy Act (Counts 4 and 5), the privacy clause in California Constitution's (Count 6), California's Unfair Competition Law (Count 7), and California's Comprehensive Computer Data Access and Fraud Act (Count 8); violations of the Massachusetts Right to Privacy Law and the Michigan Eavesdropping Statute (Counts 9 and 10); breach of express and implied

contract (Counts 11 and 12); unjust enrichment (Count 13); violation of the New Hampshire Consumer Protection Act (Count 14); and negligence (Count 15).

## III. Analysis

SNHU moves to dismiss the complaint for failure to state a claim, arguing that the plaintiffs cannot maintain any of their statutory, constitutional, or common law theories because they consented to the terms of the Privacy Policy and thus to the data disclosures they challenge. SNHU further contends that because Zeolla and Kellogg agreed to the Privacy Policy in July and November of 2023, respectively, their claims under the California Invasion of Privacy Act (Counts 4-5), the Electronic Communications Privacy Act (Count 2), and the California Constitution (Count 6) are time-barred. SNHU also argues for dismissal of each count on the grounds that the plaintiffs fail to plead essential elements of all 15 claims.

At oral argument, the plaintiffs conceded that legislation passed after they filed their complaint applies retroactively to bar their claim under California Invasion of Privacy Act §§ 638.50 & 638.51 (Count 5). The court considers SNHU's arguments for dismissal of the remaining 14 counts in turn, beginning with SNHU's threshold challenges on consent and statute-of-limitations grounds.

### A. Consent

SNHU argues that the complaint must be dismissed because all 14 claims depend upon a lack of notice and consent, and the plaintiffs consented to the tracking technologies. SNHU's theory of consent relies on its Privacy Policy, which discloses the use of cookies and third-party tracking technologies, including for targeted advising, and

provides that using SNHU's web properties amounts to consent to its terms. SNHU contends that the named plaintiffs expressly agreed to the Privacy Policy because each accepted the SMS Terms & Conditions when they clicked "Get Info" on SNHU's information request screen, and the SMS Terms & Conditions incorporate the Privacy Policy.

SNHU's argument that the named plaintiffs had actual knowledge of and expressly agreed to the Privacy Policy thus depends on documents and evidence that are not properly before the court at this stage. As explained above, the court declines to consider the SMS Terms & Conditions or the declaration from SNHU's counsel purporting to establish that each plaintiff accepted those terms. Without that evidence, SNHU has not established that the plaintiffs affirmatively assented to the Privacy Policy.

To the extent that SNHU argues that the plaintiffs consented to the Privacy Policy merely by continuing to use SNHU's web properties, it does not cite (and the court is not aware of) any authority for supporting contention. Courts are "reluctant to enforce" so-called "'browsewrap agreements,' in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Daschbach v. Rocket Mortg., LLC*, 2023 WL 2599955, at *6 (D.N.H. Mar. 22, 2023) (quoting *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014)). Nor has SNHU established consent under an "inquiry notice theory," which permits a finding of an enforceable agreement "only if: '(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a

box, that unambiguously manifests his or her assent to those terms.'" *Id.* (quoting *Nguyen*, 763 F.3d at 1177).[28] The complaint here does not allege that the plaintiffs took any affirmative action manifesting their assent to the Privacy Policy, and the materials properly before the court do not establish otherwise. Accordingly, the court cannot conclude at this stage that the plaintiffs consented to the Privacy Policy. *See Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 491 (N.D. Cal. 2021) (finding that the issue of consent, which is a "key factual dispute," must be decided "on the merits rather than a Rule 12 motion").

Even if the court considered evidence that the plaintiffs accepted the SMS Terms & Conditions, however, that would not resolve whether they consented to the specific data disclosures challenged in this litigation. "For consent to be actual, the disclosures must 'explicitly notify' users of the conduct at issue." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024). If a user "could have plausibly understood the disclosures as *not* disclosing that the defendant would engage in particular conduct, then the disclosures are insufficient to establish consent." *Id.* Here, although the Privacy Policy discloses the use of third-party tracking technologies, it also references the FERPA Policy, which represents that "personally identifiable information contained in student education records" will not be disclosed without a student's written consent, "except as permitted by law." Reading these policies together, a reasonable user could understand SNHU's disclosures to mean that its use of third-party tracking technologies

---

[28] When asked at oral argument to identify the governing standard for inquiry notice, SNHU itself pointed to this test from *Daschbach*. *See* Tr. (doc. no. 42) at 21:7-20.

would not extend to the disclosure of student information protected by the FERPA Policy. As SNHU conceded during oral argument, the challenged disclosures do not solely entail the release of unprotected "directory information."[29] Thus, whether the policies sufficiently disclosed the particular data-sharing practices at issue in this case such that the plaintiffs' acceptance of those policies constitutes consent to the challenged disclosures cannot be resolved at this preliminary stage. *See In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019) ("[I]f the contract language at issue is reasonably susceptible to more than one interpretation, with one of those interpretations suggesting consent and another belying it, the Court cannot decide the consent issue in [the defendant's] favor at the motion to dismiss stage."); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021) (declining to find consent on a motion to dismiss because defendant did not disclose how it used plaintiffs' data with the sufficient "level of specificity").

**B. <u>Statute of limitations</u>**

SNHU argues that because Zeolla and Kellogg agreed to the Privacy Policy in July and November of 2023—more than two years before the filing of this suit—their claims under the Electronic Communications Privacy Act (ECPA) (Count 2), the California Invasion of Privacy Act (Count 4), and the California Constitution (Count 6) are time-barred.[30] But Zeolla and Kellogg are citizens of Massachusetts and Michigan,

---

[29] *See, e.g.*, Tr. (doc. no. 42) at 39:10-24.
[30] Mot. to Dismiss (doc. no. 31-1) at 11-12.

respectively, and neither asserts any claims under California law.[31] The court therefore need only consider the timeliness of Zeolla and Kellogg's claims under the ECPA, which are subject to a two-year statute of limitations, *see* 18 U.S.C. § 2520(e).

"Where the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate." *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008). The plaintiffs contend that equitable estoppel applies because SNHU concealed its use of tracking technologies, which were within SNHU's "exclusive knowledge" and undisclosed to students, while misleadingly representing it would not share the plaintiffs' private educational records with third parties.[32]

The court need not resolve that contention at this stage because SNHU has not established that the limitations period expired. Its argument relies on factual assertions in counsel's declaration that are not properly before the court on a motion to dismiss. The complaint does not identify when Zeolla applied to SNHU and alleges only that Kellogg remained enrolled through December 2025. Moreover, the Privacy Policy properly before the court is dated March 7, 2025, and the record does not establish when, how, or in what form any earlier version was made available to either plaintiff. Because the

---

[31] Compl. (doc. no. 28) ¶¶ 16, 24. Counts 4 and 6 are brought "on behalf of Plaintiffs Wright and Loftus and the California subclass." *Id.* at pp. 55, 59.
[32] *Id.* ¶¶ 168-75.

statute-of-limitations defense is not apparent from the face of the complaint, SNHU's motion to dismiss Zeolla's and Kellogg's ECPA claims as untimely is denied.

### C. Invasion of privacy claims (Counts 1, 6, and 9)

The plaintiffs assert three invasion of privacy claims under New Hampshire, California, and Massachusetts law.

***New Hampshire (Count 1).*** "New Hampshire law recognizes the tort of intrusion upon seclusion." *Remsburg v. Docusearch, Inc.*, 2002 WL 844403, at *4 (D.N.H. Apr. 25, 2002). "Its elements include: (1) an invasion of something secret, secluded or private pertaining to the plaintiff…; and (2) conduct by the defendant that exceeds the limits of decency, such that the defendant should have realized that it would be offensive to a person of ordinary sensibilities." *Id.* In assessing the first element, the court must determine whether the plaintiff had a reasonable expectation of privacy in the information at issue. *Remsburg v. Docusearch, Inc.*, 149 N.H. 148, 156 (2003). As to the second, "whether the intrusion would be offensive to persons of ordinary sensibilities is ordinarily a question for the fact-finder and only becomes a question of law if reasonable persons can draw only one conclusion from the evidence." *Id.* at 156-57. SNHU moves to dismiss this claim on the grounds that the plaintiffs voluntarily disclosed the information at issue to SNHU, consented to the challenged disclosures, and fail to identify sufficiently offensive conduct to support their claim.

The court is not persuaded that dismissal is warranted on any of these grounds. The plaintiffs allege that SNHU disclosed information, including grade point averages, that appears to fall within FERPA's protections. In *Remsburg*, the New Hampshire

Supreme Court concluded that an individual had a reasonable expectation of privacy in her Social Security number, reasoning that the confidentiality of such information was recognized by numerous statutes and that entities possessing it were "bound by legal, and, perhaps, contractual constraints to hold SSNs in confidence to ensure that they remain private." 149 N.H. at 156. Similar considerations apply to personally identifiable information contained in student education records, the confidentiality of which is protected by FERPA and SNHU's own policies. *See Porten v. Univ. of S.F.*, 64 Cal. App. 3d 825, 831-32 (1976) (finding that unauthorized disclosure of college transcript constituted an invasion of privacy); *Info. Acquisition Corp. v. Dep't of Justice*, 444 F. Supp. 458, 464 (D.D.C. 1978) (finding that college grades are "'core' personal information . . . the release of which will normally constitute a clearly unwarranted invasion of privacy"). The plaintiffs' voluntary disclosure of that information to SNHU does not defeat that claim, as the alleged invasion of privacy concerns SNHU's subsequent disclosure of information to third parties in violation of SNHU's policies. *See Doe v. Shady Grove Reprod. Sci. Ctr., P.C.*, 2025 WL 2781542, at *6 (D. Md. Sept. 30, 2025) (rejecting argument that information "voluntarily provided" is not an intrusion where the defendant exceeded the expected handling of such information and disclosed it to analytics companies).

SNHU's consent argument likewise fails for the reasons previously discussed. Although the Privacy Policy disclosed the use of third-party tracking technologies, the FERPA Policy separately represented that personally identifiable information contained in student education records would not be disclosed without consent, except as authorized

by law. Even if the record before the court established that the plaintiffs were on inquiry notice that SNHU shared certain personal information with third parties, that would not establish that they consented to the disclosure of statutorily protected education records. Finally, whether the alleged disclosures were sufficiently offensive to a person of ordinary sensibilities presents a factual question that cannot be resolved in SNHU's favor at this stage. *See Remsburg*, 149 N.H. at 156-57. Accordingly, the court denies SNHU's motion to dismiss the invasion of privacy claim under New Hampshire law.

***California Invasion of Privacy Act (Count 6).*** To state a claim for intrusion upon seclusion under California law, a plaintiff must plead that "(1) the defendant intentionally intruded into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy, and (2) the intrusion occurred in a manner highly offensive to a reasonable person." *Brown v. Google LLC*, 685 F. Supp. 3d 909, 941 (N.D. Cal. 2023). "A claim for invasion of privacy under the California Constitution involves similar elements." *Id.* Whether a plaintiff had a reasonable expectation of privacy is an objective inquiry, *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 231 (1998), and the relevant question in the context of third-party tracking technologies is "whether a user would reasonably expect that the tracking companies would have access to the … data." *Brown*, 685 F. Supp. 3d at 941. Determining the offensiveness of the intrusion requires consideration of "factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Id.*

SNHU moves to dismiss these claims on substantially the same grounds asserted with respect to the plaintiffs' New Hampshire intrusion upon seclusion claim. Specifically, SNHU contends that the plaintiffs could not reasonably expect privacy in information collected through tracking technologies whose use SNHU disclosed and to which the plaintiffs consented, and that the alleged conduct does not constitute an egregious breach of social norms. These arguments fail for the reasons already discussed: the plaintiffs allege that SNHU disclosed personally identifiable information protected by FERPA to third parties without their consent, notwithstanding its representations concerning the confidentiality of student education records, and neither the prevalence of tracking technologies nor the general disclosures in SNHU's Privacy Policy forecloses a reasonable expectation of privacy in that information. Moreover, whether the alleged disclosures were sufficiently offensive to support the plaintiffs' claims requires a fact-intensive inquiry inappropriate for resolution at this stage. The court therefore denies SNHU's motion to dismiss the California invasion of privacy claims.

***Massachusetts.*** Massachusetts law prohibits interferences with privacy that are "unreasonable, substantial or serious." M.G.L. c. 214, § 1B. To sustain a claim under this provision, a plaintiff must sufficiently allege an invasion of privacy that is "both unreasonable and substantial or serious." *Ortiz v. Examworks, Inc.*, 470 Mass. 784, 793 (2015). SNHU argues that the plaintiffs' claim under § 1B fails for the same reasons as their New Hampshire intrusion upon seclusion claim because Massachusetts courts employ a parallel analysis. As SNHU advances no independent basis for dismissal under

Massachusetts law, its motion fails for the same reasons discussed with respect to Count 1. The court denies SNHU's motion to dismiss the Massachusetts invasion of privacy claim.

**D. <u>Electronic Communications Privacy Act (Count 2)</u>**

The ECPA "provides a private right of action against one who 'intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication.'" *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003) (quoting 18 U.S.C. § 2511(a)). The statute "defines 'intercept' as 'the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.'" *Id.* (quoting 18 U.S.C. § 2510(4)). A statutory exception precludes liability for intercepting a communication if the person "is a party to the communication." 18 U.S.C. § 2511(2)(d). That exception does not apply, however, if the party intercepted the communication "for the purpose of committing any criminal or tortious act in violation of the Constitution of laws of the United States or of any State." *Id.*

"A plaintiff seeking to invoke the crime-tort exception must 'plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording or interception itself.'" *M.C. 1 v. Curriculum Assocs., LLC*, 2026 WL 2949062, at *3 (D. Mass. Sept. 30, 2026) (quoting *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 145 (3d Cir. 2015)). "Specifically, either the 'primary motivation' or a 'determinative factor' in the actor's decision to record [is] the intent to commit a

criminal or tortious act." *Goulart v. Cape Cod Healthcare, Inc.*, 2025 WL 1745732, at *3 (D. Mass. June 24, 2025) (quoting *United States v. McHugh*, 57 F. Supp. 3d 95, 99-100 (D. Mass. 2014)).

The plaintiffs do not dispute that, as a party to the communications, SNHU is exempt from liability under the ECPA unless the crime-tort exception applies.[33] They allege that the exception applies because SNHU "acted with a tortious and criminal purpose" in utilizing and embedding the tracking technologies, arguing that SNHU "intentionally sought to disclose [the] [p]laintiffs' and [c]lass members' private data to third parties to use… for targeted advertising" in violation of FERPA.[34] SNHU disputes that the challenged disclosures violate FERPA but argues, in any event, that intentionally engaging in targeted advertising does not support the inference that SNHU purposefully committed a separate crime or tort.

District courts in the First Circuit have repeatedly considered and rejected the plaintiffs' theory that a website operator's knowing use of tracking technology to share user information with third parties for advertising supports an inference that the operator acted "for the purpose of" committing an independent crime or tort. In *Goulart*, for example, the plaintiffs alleged that a nonprofit hospital system installed the Meta Pixel and similar tools to share patient information with advertisers in exchange for enhanced advertising and analytics services. 2025 WL 1745732, at *4. The court held that these allegations supported an inference that the hospital's "primary motivation" in disclosing

---

[33] *See* Opp. to Mot. to Dismiss (doc. no. 32) at 13-14.
[34] Compl. (doc. no. 28) 211; Opp. to Mot. to Dismiss (doc. no. 32) at 14.

the plaintiffs' personal health information was not to violate HIPAA or commit a tort but rather "commercial gain or convenience," adding that "commercial purposes or advantages are not the stuff of which a crime-tort is made." *Id.* The court also noted its skepticism of the plaintiffs' argument that a violation of HIPAA constitutes a tortious or criminal act that is independent and separate from the healthcare company's interception when their allegations "encompass[ed] only the simultaneous interception and disclosure of information to Facebook and Google." *Id.* at *4 n.3. Other judges have reached the same conclusion on similar allegations. *See Progin v. UMass Mem'l Health Care, Inc.*, 2026 WL 632770, at *5 (D. Mass. Mar. 6, 2026) (Burroughs, J.) (finding allegations that defendants purposefully installed tracking tools and disclosed information to Facebook and Google did not support an inference that they purposefully committed separate criminal or tortious acts); *McManus v. Tufts Med. Ctr., Inc.*, 2025 WL 2778025, at *3 (D. Mass. Sept. 29, 2025) (Burroughs, J.) (finding allegations that hidden code allowed third parties to intercept and use communications did not support an inference that the defendant's purpose was to violate HIPAA or the FTC Act); *Doe v. Lawrence Gen. Hosp.*, 2025 WL 2808055, at *16 (D. Mass. Aug. 29, 2025), *report and recommendation adopted in part, rejected in part,* 2025 WL 2807673 (D. Mass. Sept. 30, 2025) (finding allegations that an operator knowingly disclosed protected health information might state a HIPAA violation but did not satisfy the ECPA's separate "purpose" element). These decisions emphasize the distinction between knowledge that a disclosure will occur, which may be enough for the underlying statutory violation, and the separate purpose the crime-tort exception requires.

The plaintiffs contend that their ECPA claim stands on stronger footing because they allege that SNHU acted "intentionally, rather than accidentally or by happenstance" by "configur[ing] the specific data fields to be shared, which revealed private data like GPAs and coursework, and ultimately used this data through these ad systems."[35] Those allegations support an inference that SNHU deliberately chose what information to transmit but do not differ in kind from the allegations in the cases above, which also involved the deliberate installation of tracking technology and the intentional disclosure of protected information. If anything, the plaintiffs' argument is on weaker ground given that SNHU's own published policies disclose its use of third-party tracking technologies, including for targeted advertising, and state that SNHU may share designated "directory information" without consent. While insufficient to establish consent, such disclosures publicly describing a practice of sharing certain student information undercut the notion that SNHU was acting with the "primary motivation" of committing an unlawful disclosure. Rather, as in *Goulart*, the plaintiffs' allegations support an inference that SNHU sought to obtain a "commercial gain or convenience" by sharing user data. 2025 WL 1745732, at *4. They do not show that violating FERPA or committing torts, as opposed to obtaining that commercial benefit, was SNHU's "primary motivation" or a "determinative factor" in its conduct. *Id.* at *3 (quoting *United States v. McHugh*, 57 F. Supp. 3d 95, 99-100 (D. Mass. 2014)).

---

[35] Opp. to Mot. to Dismiss (doc. no. 32) at 14.

Because the plaintiffs allege no facts suggesting a criminal or tortious purpose independent of the interception itself, the crime-tort exception does not apply, and SNHU's status as a party to the communications bars the ECPA claim.

**E. <u>New Hampshire Wiretap Act (Count 3)</u>**

The plaintiffs allege that SNHU violated several provisions of the New Hampshire Wiretap Act ("NHWA") by willfully intercepting, disclosing, and using the plaintiffs' and class members' telecommunications without their consent via the tracking technologies. *See* RSA § 570-A:2, I(a), (c), and (d). The NHWA defines a "telecommunication" as "the transfer of any form of information in whole or in part through the facilities of a communications common carrier." RSA 570-A:1, I. "Communications common carrier," in turn, is defined to mean "a person engaged in providing communications services to the general public through transmission of any form of information between subscribers by means of wire, cable, radio or electromagnetic transmission, optical or fiber-optic transmission, or other means which transfers information without physical transfer of medium, whether by switched or dedicated facilities," but also includes "any wireless technology that uses a wireless entry or access point to transmit or receive any form of information." RSA 570-A:1, IX.

SNHU raises three arguments for dismissal. First, it argues that the plaintiffs' NHWA claim should be dismissed because they allegedly consented to the challenged disclosures. Second, SNHU argues that internet service providers fall outside the definition of "communications common carrier[s]" and, accordingly, that challenged

disclosures are not actionable "telecommunication[s]" under the statute.[36] Third, SNHU asserts that the New Hampshire legislature's recent enactment of the New Hampshire Data Privacy Act indicates that the NHWA was not intended to govern the use of tracking technology.

SNHU's consent argument fails for the reasons stated above. Its alternative arguments fare no better. To start, SNHU provides no authority for its contention that "the term 'common carrier' categorically excludes internet service providers."[37] SNHU relies only on *Ohio Telecom Ass'n v. FCC* (*In re MCP No. 185*), 124 F.4th 993 (6th Cir. 2025), in which the Sixth Circuit Court of Appeals held that broadband internet providers do not offer a "telecommunications service" under the federal Communications Act, 47 U.S.C. § 153(24), (51). The court did not interpret the NHWA, whose definition of "communications common carrier" is framed differently and, unlike the federal provisions, expressly includes wireless technologies that use a wireless access point. RSA 570-A:1, IX. Neither the New Hampshire Supreme Court nor this court has held that internet communications fall outside the NHWA; to the contrary, both courts have allowed NHWA claims based on online communications to proceed because the parties did not dispute the point. *See State v. Lott*, 152 N.H. 436, 438 (2005) (noting that "[b]oth the State and the defendant agree that the instant message communications at issue qualify as telecommunications" before analyzing claim under RSA 570-A:2); *Cancelmo v. S. N.H. Med. Ctr.*, 2025 WL 2783652, at *3 n.3 (D.N.H. Sept. 30, 2025) (Elliott, C.J.)

---

[36] Mot. to Dismiss (doc. no. 31-1) at 16-17.
[37] Mot. to Dismiss (doc. no. 31-1) at 17.

(noting that "the defendants evidently do not dispute that the internet service providers involved in the website activity at issue in this case are 'communications common carriers' for the purpose of the statute" and allowing NHWA claims based on tracking technologies to proceed). Without authority construing the NHWA's text to exclude internet service providers, and given that the statutory definition reaches "any wireless technology that uses a wireless entry or access point to transmit or receive any form of information," RSA 570-A:1, IX, the court cannot conclude as a matter of law that the challenged disclosures did not constitute transfers of information "through the facilities of a communications common carrier." *See* RSA § 570-A:2, I(a), (c), and (d).

Lastly, the court declines SNHU's invitation to circumscribe the scope of the NHWA in light of the recent enactment of the New Hampshire Data Privacy Act. The only interpretative question raised by SNHU is whether the plaintiffs' communications fall within the NHWA's definition of "telecommunication," and that definition is not ambiguous: nothing in the statutory text excludes information transmitted over the internet. The court therefore "need not consider extrinsic sources of interpretation such as purportedly identifiable statutory purpose, or anything else beyond the language of the statute." *United States v. Potter*, 610 F. Supp. 3d 402, 417 (D.N.H. 2022), *aff'd*, 78 F.4th 486 (1st Cir. 2023); *see State Emps.' Ass'n of N.H., Inc., SEIU Loc. 1984 v. State*, 161 N.H. 558, 561 (2011) ("When statutory language is ambiguous, however, we will consider legislative history and examine the statute's overall objective."); *Hogan v. Pat's Peak Skiing, LLC*, 168 N.H. 71, 74-75 (2015) (considering the statute's policy interests

only after finding its language ambiguous). SNHU's motion to dismiss the NHWA claim is therefore denied.

## F. California Invasion of Privacy Act, Cal. Penal Code § 631 (Count 4)

Section 631 of the California Invasion of Privacy Act ("CIPA") penalizes any person who

> [1] intentionally taps, or makes any unauthorized connection ... with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, [2] or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being set from, or received at any place within this state; [3] or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [4] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this [S]ection.

Cal. Penal Code § 631(a) (subdivisions added for ease of reference). The plaintiffs allege that SNHU violated the third and fourth variants by installing and utilizing the tracking companies. SNHU moves to dismiss on largely overlapping grounds, arguing that the plaintiffs' consent to the tracking technologies bars its claim and that CIPA, like the NWTA, "was never meant to apply to modern uses of online tracking technologies."[38]

Neither threshold argument warrants dismissal. SNHU's consent argument fails for the reasons discussed above. Its broader argument that CIPA was never meant to

---

[38] Mot. to Dismiss (doc. no. 31-1) at 20.

extend to tracking technologies is similarly unpersuasive. Like with the NHWA, SNHU identifies no authority for the proposition that claims arising out of the use of tracking technologies are categorically barred under the CIPA. Instead, it relies on one district court's observation that "there is reason to question whether the [California] Legislature intended for CIPA to apply" to such claims because, inter alia, "California has since adopted other statutes that more clearly speak to the practice of data sharing." *Doe v. Eating Recovery Ctr., LLC*, 806 F. Supp. 3d 1109, 1119 (N.D. Cal. 2025). Indeed, even that court did not hold that CIPA is categorically unavailable for such data privacy claims. *See id.* (resolving the CIPA claim based on an interpretation of § 631(a)'s "in transit" requirement). Courts continue to regularly permit § 631(a) claims arising out of tracking technologies to proceed. *See, e.g.*, *In re Meta Android Privacy Litig.*, 2026 WL 3308177, at *2 (N.D. Cal. Nov. 2, 2026) (denying motion to dismiss § 631(a) claim arising out of use of tracking technologies); *Diaz v. Paramount Skydance Corp.*, 2026 WL 2930820, at *9 (C.D. Cal. Sept. 29, 2026) (same); *M.C. 1*, 2026 WL 2949062, at *6-7 (same). The court therefore rejects SNHU's contention that doing the same here would mark an expansion of CIPA's application.

SNHU also moves to dismiss on the grounds that the plaintiffs fail to plead that the tracking technologies read or learned the contents of their communications while "in transit" as required by § 631(a). Specifically, SNHU argues that the complaint only states, in conclusory fashion, that the tracking technologies transmit users' communications "contemporaneously" and "in real-time" without explaining "the

workings" of any one of the tracking technologies.[39] But SNHU's characterization does not hold up against the complaint, which describes how each tracker works by capturing users' data as they interacted with SNHU's web properties. For example, the complaint alleges that Google "begin[s] intercepting [the plaintiffs' and class members'] data from the moment they log on to the mySNHU portal," permitting Google to receive, inter alia, the students' IP addresses, browser information, and "full-string URLs reflecting that the student has logged into the SNHU student portal."[40] The complaint further alleges that the Meta pixel "record[s]" each page a prospective student visited during the application process and that Google likewise "secretly sp[ies]" on prospective students "as they… navigate through the application" process, "noting what 'opportunity_stage' the individual was at."[41] The complaint makes comparable allegations about the Snapchat and TikTok trackers and supports those allegations with screenshots showing the network transmissions.[42] These allegations are more than sufficient to plead the "in transit" element required by § 631(a). *See, e.g.*, *Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 868 (N.D. Cal. 2026) (finding "in transit" element adequately pleaded where the complaint included "detailed descriptions of how OpenX's pixel technology purportedly works" and alleged that, once loaded onto a user's browser, the pixel intercepted the full-string URL of each page the user visited).

[39] *Id.* at 20.
[40] Compl. (doc. no. 28) ¶ 119.
[41] *Id.* ¶¶ 125-26.
[42] *Id.* ¶¶ 131-35, Figures 12-13.

**G. <u>California's Unfair Competition Law (Count 7) and Comprehensive Computer Data Access and Fraud Act (Count 8)</u>**

SNHU challenges the California plaintiffs' claims under California's Unfair Competition Law ("UCL") and Comprehensive Computer Data Access and Fraud Act ("CDAFA") on the grounds that the plaintiffs lack statutory standing under either statute, which limit private rights of action to plaintiffs who have "lost money or property" or "damage or loss by reason of a violation," respectively. Cal. Bus. & Prof. Code § 17204; Cal. Penal Code § 502(e)(1). Because the plaintiffs rely on largely overlapping theories of injury under both statutes, the court addresses the claims together.

***UCL.*** The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200. To bring a UCL claim, a person must have "suffered injury in fact and ... lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Thus, a UCL plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original).

SNHU argues that the plaintiffs lack statutory standing because they fail to allege sufficient economic injury. The court agrees. The plaintiffs do not contend that SNHU's alleged actions caused them to lose any money. Instead, they contend that the challenged disclosures deprived them "of control over their valuable property (namely, their private

data), the ability to receive compensation for that data, and the ability to withhold their data for sale."[43] But the plaintiffs have not alleged "how this information has economic value *to [them]*. That the information has external value, but no economic value to [the] plaintiff[s], cannot serve to establish that [the] plaintiff[s] ha[ve] personally lost money or property." *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019); *see also* *Hazel v. Prudential Fin., Inc.*, 2023 WL 3933073, at *6 (N.D. Cal. June 9, 2023) ("[J]ust because Plaintiffs' data is valuable in the abstract, and because [Apple] might have made money from it, does not mean that Plaintiffs have 'lost money or property' as a result."); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1093 (N.D. Cal. 2018) ("[T]he sharing of names, user IDs, location and other personal information does not constitute lost money or property for UCL standing purposes.").

The plaintiffs acknowledge that "some courts have rejected the principle that data has value that causes an actionable loss of money or property" but contend that the "better-reasoned cases" are those that recognize the objective value of private information: namely, *Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021) and *Brown v. Google LLC*, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021).[44] But a number of courts have disagreed with *Calhoun's* holding that "plaintiffs who suffered a loss of their personal information suffered economic injury and [have] standing" to sue

---

[43] *Id.* ¶ 274.

[44] Opp. to Mot. to Dismiss (doc. no. 32) at 40. The plaintiffs also cite other decisions from the Northern District Court for the District of California that incorporate *Calhoun* and *Brown's* reasoning. *See* *Kis v. Cognism*, 2024 WL 3924553, at *7 (N.D. Cal. Aug. 23, 2024); *Doe v. GoodRx Hldgs., Inc.*, 2025 WL 2052302, at *12 (N.D. Cal. July 22, 2025).

under the UCL, including because the *Calhoun* court rested that finding "on four cases that address Article III standing, which is different from UCL standing." *Colette*, 536 F. Supp. 3d at 484 n.8 (distinguishing *Calhoun*)); *see also Griffith v. TikTok, Inc.*, 697 F. Supp. 3d 963, 977 (C.D. Cal. 2023) (observing that "the sole Ninth Circuit case cited for this proposition in *Calhoun*" found that allegations that the plaintiffs lost the sales value of their personal information disseminated by Facebook "were sufficient to establish the damages elements of the plaintiffs' breach of contract and fraud claims, but *not* to establish UCL standing" (citing *In re Facebook Priv. Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) ("We affirm the district court's dismissal of plaintiffs' UCL claim because plaintiffs failed to allege that they 'lost money or property as a result of the unfair competition.'")).

The plaintiffs' reliance on *Brown* is likewise unpersuasive as the plaintiffs there alleged a market in which consumers are paid for the very type of data at issue, including through the defendant's own program paying users for their browsing data. *See* 2021 WL 6064009, at *15 (alleged loss of PII value sufficient under UCL where "each named Plaintiff [] alleged that he or she is aware of" platforms willing to pay individuals for data and the defendant "itself has set up a project… which pays internet users… to add a browser extension that shares with [the defendant] the sites they visit and how they use them" (quotations omitted)). While the plaintiffs' allegations here show that education-related data is valuable to SNHU, which spends money to attract prospective students, and to the technology companies, which use the data to conduct targeted advertising, the complaint does not identify any market in which the plaintiffs could sell the type of

personal and educational information at issue in the challenged disclosures (e.g., GPAs, course enrollments, financial-aid status, or demographic details).[45] *See Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1229 (N.D. Cal. 2022) (to successfully demonstrate injury in fact by diminution in value of PI, plaintiffs must "establish both the existence of a market for her personal information and an impairment of her ability to participate in that market"). In any event, "[t]he weight of the authority" in California and the Northern District of California (i.e., the district that decided Calhoun and Brown) "point in the opposite direction: the 'mere misappropriation of personal information' does not establish compensable damages." *Dellasala v. Samba TV, Inc.*, 2026 WL 1138358, at *10 (N.D. Cal. Apr. 21, 2026) (quoting *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 943 (N.D. Cal. 2023) (cleaned up)); *see also Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 615 (9th Cir. 2021) ("Several courts in [the Ninth Circuit] have found, and we agree, that the 'mere misappropriation of personal information' does not establish compensable damages." (citation omitted)); *see also Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 540-41, n.13 (2022) (finding unpersuasive federal cases that held that a loss of privacy in one's information was sufficient to allege UCL standing).

The plaintiffs' two alternative theories of standing fare no better. First, relying on *In re Facebook, Inc. Internet Tracking Litigation*, the plaintiffs argue that they have UCL standing under a theory of unjust enrichment. *See* 956 F.3d 589, 597-601 (9th Cir. 2020).

---

[45] Compl. (doc. no. 28) ¶¶ 158-67.

But "the discussion of standing in *Facebook Tracking*… does not resolve this dispute, because that case did not address the UCL and considered only Article III standing." *Griffith v. TikTok, Inc.*, 697 F. Supp. 3d 963, 977 (C.D. Cal. 2023) (citing *Facebook Tracking*, 956 F.3d at 597-601). The "requirement that injury be economic renders standing under [the UCL] substantially narrower than federal standing under [Article III], which may be predicated on a broader range of injuries" and allegations that satisfy the latter do not automatically satisfy the former. *In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 973 (N.D. Cal. 2021); *see Hazel*, 2023 WL 3933073, at *6 (rejecting reliance on *Facebook Tracking* to establish UCL standing because "as many courts have pointed out, a plaintiff may have Article III standing but nevertheless fail to demonstrate UCL standing"). That SNHU may have profited from the plaintiffs' data does not show that the plaintiffs themselves lost money or property as necessary to confer statutory standing. *See Hazel*, 2023 WL 3933073, at *3 ("[J]ust because Plaintiffs' data is valuable in the abstract, and because [Apple] might have made money from it, does not mean that Plaintiffs have 'lost money or property' as a result.").

Lastly, the plaintiffs allege that, had they known of SNHU's disclosures, "they would not have paid or would have paid less for [] SNHU's services, including enrollment."[46] It is true that benefit-of-the-bargain damages can support UCL standing. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (finding statutory standing under the UCL where a plaintiff alleged that he would not have purchased a

---

[46] *Id.* ¶ 166.

product but for the defendant's alleged misrepresentation). But "[c]ourts typically find such allegations sufficient where plaintiff relied on affirmative representations by the seller, without which, the plaintiff buyer would have paid less." *Tash v. Vision Serv. Plan*, 2026 WL 1012680, at *5 (E.D. Cal. Apr. 14, 2026) (citing *Hinojos*, 718 F.3d at 1103, 1104 n.3); *see also In re LinkedIn User Priv. Litig.*, 2014 WL 1323713, at *5-6 (N.D. Cal. Mar. 28, 2014) (finding standing where plaintiff alleged that she read and relied on LinkedIn's misrepresentations in deciding to buy a premium subscription). The complaint here alleges no such reliance. To the contrary, the plaintiffs allege that they "had no way of knowing" about the tracking technologies because they "were inconspicuously incorporated in code running in the background."[47] And while the complaint points to a representation concerning the disclosure of protected education records in the FERPA Policy, it does not allege that Wright or Loftus read that policy or relied on it in deciding to enroll or pay tuition. Moreover, the FERPA Policy itself states that SNHU may disclose directory information without consent, and links to the Privacy Policy, which specifically discloses SNHU's use of tracking technologies. This distinguishes this case from *Stark v. Patreon, Inc.*, in which the plaintiffs identified the specific website policy that failed to disclose the defendant's use of the Facebook Pixel and prior versions of that policy that affirmatively promised the defendant would "never provide your information to third parties for marketing purposes without your prior consent." 635 F. Supp. 3d 841, 855 (N.D. Cal. 2022). Absent allegations that the

---

[47] *Id.* ¶ 139.

plaintiffs relied on a representation by SNHU in paying for its services, their benefit-of-the-bargain theory does not establish UCL standing.

***CDAFA.*** The CDAFA prohibits the "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). To have standing to bring a civil claim under CDAFA, a private plaintiff must have suffered "damage or loss by reason of a violation" of the statute. *Id.* at § 502(e)(1). The plaintiffs offer three theories of loss: (1) SNHU unjustly profited from their data; (2) they lost control over, and the ability to be compensated for, data with objective value; and (3) they lost "device resources, including bandwidth, CPU time, data usage, and power consumption."[48]

The first two theories fail under the CDAFA for the same reasons they fail under the UCL: courts consistently hold that the loss of control over one's data, its diminished value, or a defendant's profits from it do not amount to "damage or loss" under the CDAFA. *See, e.g., Cottle*, 536 F. Supp. 3d at 488 (finding damage or loss under CDAFA did not include "loss of the right to control [Plaintiffs'] own data, the loss of the value of their data, and the loss of the right to protection of the data"); *Doe v. Cnty. of Santa Clara*, 2024 WL 3346257, at *9 (N.D. Cal. July 8, 2024) (rejecting plaintiff's argument that damages based on the value of personal health data that defendant intercepted using "tracking pixels" suffices under CDAFA); *see also Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 845 (E.D. Cal. 2025) ("Where, as here, 'plaintiffs allege that their privacy

---

[48] Compl. ¶ 288.

has been invaded because of the disclosure of sensitive and private healthcare information—plaintiffs cannot base their CDAFA damages on a theory that they lost a benefit to sell that data themselves.'" (quoting *Doe*, 2024 WL 3346257, at *9 n.7)); *Dellasala*, 2026 WL 1138358, at *9 (noting disgorgement theory "would be inconsistent ... in light of [plaintiffs'] privacy claims").

Rather, "CDAFA's private right of action contemplates some damage to the computer system, network, program, or data contained on that computer, as opposed to data generated by a plaintiff while engaging with a defendant's website." *Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1021 (C.D. Cal. 2023). The plaintiffs' third theory addresses that kind of harm, but only in conclusory terms by asserting that the tracking technologies consumed bandwidth, CPU time, data usage, and power without "offer[ing] [any] factual support for these allegations." *See Doe I v. Google, LLC*, 741 F.Supp. 3d 828, 846 (N.D. Cal. 2024) (dismissing similar theory as insufficiently alleged where "it is not obvious how the presence on one's computer of the cookies from the providers' websites would result in any cognizable reduction in storage, disk space, or performance" nor how "the existence of cookies physically impairs the functioning of the plaintiffs' computing devices"); *see also Tenet Healthcare*, 789 F. Supp. 3d at 845 (rejecting theory that placing a cookie on plaintiffs' devices caused loss where plaintiffs "failed to plead any measurable decrease in storage, memory, or any other impairment to their computing devices' functioning"). Because the plaintiffs have not alleged cognizable damage or loss arising out the asserted CDAFA violation, their claim will be dismissed for lack of statutory standing.

**H. Michigan Eavesdropping Statute (Count 10)**

The Michigan Eavesdropping Statute prohibits a person from willfully "us[ing] any device to eavesdrop upon the conversation without the consent of all parties" or knowingly assisting "another person to do the same." Mich. Comp. Laws § 750.539c. The statute defines "eavesdropping" as "overhear[ing], record[ing], amplify[ing], or transmit[ting] any part of the private discourse of others without the permission of all persons engaged in this discourse." *Id.* § 750.539a. SNHU moves to dismiss this claim on two grounds, arguing that Michigan's statute permits a party to a conversation to record it without obtaining the consent of the other participants and, alternatively, that statute does not reach the conduct alleged in this case.

The court finds that dismissal is warranted on consent grounds. Although the statutory language refers to the consent of all parties, Michigan courts have interpreted the statute as a one-party consent law, and the Sixth Circuit Court of Appeals adopted that interpretation in *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022). Specifically, in *Fisher*, the Sixth Circuit held that the plaintiff failed to state a claim under the statute because the defendant allegedly recorded conversations in which she herself participated. 30 F.4th at 294 ("a participant does not violate Michigan's eavesdropping statute by recording a conversation without the consent of the other participants"). The plaintiffs identify no subsequent Michigan or Sixth Circuit authority departing from that interpretation.

Here, SNHU was a participant in the communications allegedly intercepted through use of its web properties. Its alleged conduct therefore does not violate the

statute as construed in *Fisher*. The court accordingly dismisses this claim without reaching SNHU's alternative argument concerning the statute's application to online tracking technologies.

## I. Contract claims (Counts 11-12)

***Breach of contract.*** In order to state a breach of contract claim under New Hampshire common law, "a plaintiff 'must allege sufficient facts to show (1) that a valid, binding contract existed between the parties, and (2) that [the defendant] breached the terms of the contract.'" *Martin v. Mooney*, 448 F. Supp. 3d 72, 86 (D.N.H. 2020) (quoting *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 311 (D.N.H. 2012)).[49] "A breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." *Id.* (quoting *Lassonde v. Stanton*, 157 N.H. 582, 588 (2008)). Here, the plaintiffs assert a common law breach of contract claim based on allegations that "SNHU entered into agreements" with them by "offering an application process, admission to SNHU, and the SNHU Properties."[50] They further allege that "SNHU's privacy representations formed a part of the contract between SNHU and Plaintiffs and the Class Members," and that SNHU breached that contract by making the challenged disclosures.[51] SNHU argues that the plaintiffs' general references to

[49] The parties take no position on which state's law governs the plaintiffs' common-law claims for breach of contract, unjust enrichment, and negligence (Counts 11-13, 15), nor have they have not identified any material difference among the laws of New Hampshire, Massachusetts, Michigan, and California that would affect the outcome of this motion. Further, both sides rely primarily on New Hampshire law in their briefing. We take this as an agreement to New Hampshire law. Thus, for purposes of this motion only, the court applies New Hampshire law to the plaintiffs' common-law claims.
[50] Compl. (doc. no. 28) at ¶ 310.
[51] *Id.* ¶¶ 311, 313.

SNHU's "privacy representations" do not identify a valid contract and, regardless, the plaintiffs have not adequately alleged breach or damages.

"Under New Hampshire law, the college-student relationship is contractual in nature." *Doe v. Trs. of Dartmouth Coll.*, 615 F. Supp. 3d 47, 60 (D.N.H. 2022) (citing *Anderson v. Trs. of Dartmouth Coll.*, 2020 WL 7129968, at *10 (D.N.H. Dec. 4, 2020)). "Courts have concluded that student handbooks and other materials may set out the terms of a contract between a university and its students." *Id.* (citing *Nierenberg v. Trs. of Dartmouth Coll.*, 2017 WL 10259668, at *2 (N.H. Super. Ct. July 7, 2017)). Although the complaint refers broadly to SNHU's "privacy representations," the representation on which the breach of contract claim rests is contained in the FERPA Policy, which states that SNHU will obtain written consent before disclosing personally identifiable information from students' education records. A policy of this kind may set out the terms of a contract governing the relationship between SNHU and its students. *See id.*; *see also Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998) ("The terms of the contract may include statements provided in student manuals and registration materials"). The plaintiffs have therefore adequately alleged the existence of a contract.

The plaintiffs have also adequately pleaded a breach of that contract. "The proper standard for interpreting the contractual terms is that of 'reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 48 (1st Cir. 2004) (quoting *Mangla*, 135 F.3d at 83). SNHU contends that its policies, read together, disclosed its use of third-party tracking technologies and reserved its right to share

directory information without consent. That argument fails for the reasons discussed above in connection with consent; namely, that even reading the FERPA Policy together with the Privacy Policy, a student might reasonably believe that SNHU's use of third-party tracking technologies would not extend to disclosing PII protected under FERPA. And as SNHU acknowledged at oral argument, many of the challenged disclosures, such as students' GPAs, course enrollments, and financial-aid status, cannot be fairly categorized as unprotected "directory" information.[52] Whether the data-sharing practices described in the complaint breached SNHU's commitments therefore cannot be resolved on a motion to dismiss.

Finally, the precision with which the plaintiffs plead their contract damages is immaterial because "under New Hampshire law, a plaintiff need not allege damages to sufficiently plead a breach of contract claim." *Doe*, 615 F. Supp. 3d at 61-62 (citing *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 311 (D.N.H. 2012)); *see also* *Bronstein v. GZA GeoEnvironmental,* 140 N.H. 253, 255 (1995) ("[A] cause of action arises once all the necessary elements are present. In the case of torts, it would be when the causal negligence is coupled with harm to the plaintiff. In the case of a contract action, it would be when the breach occurs." (internal quotation marks, alterations, and ellipses omitted)). Regardless, the plaintiffs allege that they did not receive the benefit of the bargain for which they paid and that they suffered privacy harms, and also seek

---

[52] Tr. (doc. no. 42) at 41:3-43:16.

nominal damages in the alternative.[53] SNHU's motion to dismiss the breach of contract claim is therefore denied.

***Breach of implied contract.*** SNHU also challenges the plaintiffs' claim for breach of implied contract, arguing that implied-fact-contracts are "true contracts" such that the count fails for the same reasons that doom the plaintiffs' express contract claim. *Chase Home for Child. v. N.H. Div. for Child., Youth & Fams.*, 162 N.H. 720, 728 (2011). The court agrees that the two theories rise or fall together and thus both survive for the same reasons just discussed. To the extent SNHU objects that the implied contract claim duplicates the express contract claim, the plaintiffs expressly plead the former in the alternative, as Federal Rule of Civil Procedure 8(d)(2)-(3) permits.

**J. Unjust enrichment (Count 13)**

"A plaintiff is entitled to restitution for unjust enrichment if the defendant received a benefit and it would be unconscionable for the defendant to retain that benefit." *Gen. Insulation Co. v. Eckman Const.*, 159 N.H. 601, 611, 992 A.2d 613, 620–21 (2010). "The party seeking restitution must establish not only unjust enrichment, but that the person sought to be charged had wrongfully secured a benefit or passively received one which it would be unconscionable to retain, and unjust enrichment generally does not form an

[53] Compl. ¶¶ 314–15. The court notes that it would find these allegations sufficient to support to a breach of contract claim under California common law notwithstanding its holding that the plaintiffs lack standing under the UCL because statutory standing under the UCL requires a specific showing of lost money or property that is narrower than the damages element of a contract claim. *See In re Facebook Priv. Litig.*, 572 F. App'x at 494 (allegations that plaintiffs were harmed by the dissemination of their personal information and by losing its sales value deemed sufficient by Ninth Circuit to establish the damages elements of the plaintiffs' breach of contract claim but not their UCL standing).

independent basis for a cause of action." *Id.* (quoting 42 C.J.S. *Implied Contracts* § 10, at 17 (2007)). The plaintiffs allege that they conferred benefits on SNHU by providing valuable and private educational information that SNHU disclosed to third-parties for marketing purposes and by paying tuition and fees. They assert that SNHU retained these benefits at their expense without compensating them. SNHU argues that the plaintiffs' unjust enrichment claim is foreclosed by the existence of a contract. It further argues that the plaintiffs fail to allege that SNHU was enriched at their expense or that SNHU's retention of any benefit would be unconscionable.

None of these arguments warrants dismissal at this stage. While SNHU is correct that a plaintiff generally cannot recover unjust enrichment based on a breach of contract, the remedy "may be available to contracting parties… where the benefit received was outside the scope of the contract." *Clapp v. Goffstown Sch. Dist.*, 159 N.H. 206, 211 (2009). Moreover, restitution remains available where a contract is "ineffective to regulate the parties' obligations." *Camden Nat'l Bank v. Greystone Select Holdings*, LLC, 2017 WL 5146166, at *4 (D.N.H. Nov. 3, 2017). Here, the scope of whatever contractual commitments exist have yet to be determined, as is the extent to which SNHU's use of the plaintiffs' data for marketing purposes falls outside those contractual terms. At this point, the plaintiffs may thus pursue their unjust enrichment claim in the alternative to their contract claims. *See* Fed. R. Civ. P. 8(d)(2)-(3).

As to SNHU's second argument, the plaintiffs allege that SNHU obtained their information through their use of its application process and student portal to improve

SNHU's advertising efforts and provided no compensation in return.[54] Those allegations sufficiently plead that SNHU received a benefit at the plaintiffs' expense. No further specifics regarding the value of any such benefit are needed, as restitution is an equitable remedy over which the court has "broad and flexible equitable powers [] allow[ing] it to shape and adjust the precise relief to the requirements of the particular situation." *Clapp*, 159 N.H. at 209-10.

Finally, the plaintiffs have adequately pleaded unconscionability. The complaint alleges that SNHU derived its benefits from "unfair and unconscionable methods, acts, and trade practices," and, further, that it would be inequitable for SNHU to retain those benefits "obtained [] through its unfair and unconscionable trade practices."[55] Again, no more is needed at this stage, as whether SNHU's retention of those benefits "affronts the sense of justice, decency, or reasonableness" is a question of fact that cannot be resolved on the pleadings. *Est. of Mortner v. Thompson*, 170 N.H. 625, 632 (2018). The court therefore denies SNHU's motion to dismiss the unjust enrichment claim.

**K. <u>New Hampshire Consumer Protection Act (Count 14)</u>**

The plaintiffs assert that SNHU's "surreptitious disclosure of private communications and personal information" without their consent amounts to an unfair trade practice actionable under the New Hampshire Consumer Protection Act ("NHCPA"). *See* RSA 358-A:1, *et seq*. The NHCPA makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the

[54] Compl. ¶¶ 325-26, 329.
[55] Compl. ¶ 330.

conduct of any trade or commerce within this state." RSA 358-A:2. The statute sets forth "examples of unfair or deceptive acts or practices," but that list is "nonexhaustive." *Quality First Sols., LLC v. Dartmouth-Hitchcock Health*, 2026 WL 2475300, at *13 (D.N.H. Aug. 24, 2026) (citing RSA 358-A:2). Even so, "the phrase 'including but not limited to' ... limits the applicability of the [NHCPA] to those *types* of acts." *Roberts v. General Motors Corp.,* 138 N.H. 532, 538, 643 A.2d 956 (1994) (brackets and quotation omitted). Conduct falling outside the listed categories is actionable only if it reaches "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Franchi v. New Hampton Sch.*, 656 F. Supp. 2d 252, 265 (D.N.H. 2009) (citation omitted). Thus, whether the NHCPA applies to a particular transaction depends upon "the activity involved, the nature of the transaction, and the parties to determine whether a transaction is a personal or business transaction." *Brzica v. Trs. of Dartmouth Coll.*, 147 N.H. 443, 451 (2002).

SNHU moves to dismiss on the ground that the conduct alleged is not actionable under the NHCPA, both because it does not appear within any of the statute's listed categories or meet the requisite standard of "rascality" for non-enumerated conduct and, more generally, because the NHCPA does not apply to non-profit universities. The plaintiffs respond that SNHU's conduct falls within RSA 358-A:2(V) and (VII), which prohibit "misrepresenting goods as being of a particular standard and having certain characteristics and benefits." RSA § 358-A:2 (V) & (VII). They also argue that SNHU engaged in non-enumerated deceptive conduct "arising out of [its] representation that it

complied with FERPA, even though it embedded tracking technology to disclose FERPA-protected data to third parties."[56]

To the extent based on allegations that SNHU represented that it would not disclose personally identifiable information from education records without consent despite knowing it had configured tracking technologies on its student portal to transmit such information to third parties, the plaintiffs have stated an actionable claim under the NHCPA. If SNHU represented that its services met a particular privacy standard while knowingly operating them in a manner inconsistent with that standard, it represented that its services had a characteristic they lacked. That theory fits within RSA 358-A:2(V) and (VII) as a misrepresentation concerning the quality of SNHU's services. Indeed, courts have sustained NHCPA claims based on similar allegations that a defendant affirmatively represented it would protect consumers' personal information while knowing it was not doing so. *See, e.g.*, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 1002 (S.D. Cal. 2014) (defendant "affirmatively represented that it would take 'reasonable security measures' to protect Plaintiffs' Personal Information" despite knowing its security was inadequate); *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 167 (D. Mass. 2024) (defendant's websites "affirmatively stated" that the defendant would "[m]aintain the privacy of [patients'] health information as required by law' when it was not doing so"). Because the alleged

[56] Opp. to Mot. to Dismiss (doc. no. 32) at 24.

conduct falls within the enumerated categories, the plaintiffs need not separately satisfy the rascality standard.[57]

SNHU's remaining argument also does not warrant dismissal. The text of the NHCPA contains no categorical exemption for nonprofit entities, and its definition of "trade or commerce" reaches the advertising, sale, or distribution of "any services." RSA 358–A:1, II. SNHU points to the Federal Trade Commission Act and the Massachusetts Consumer Protection Act as interpretive guides, but neither source establishes that the New Hampshire Supreme Court would read into the NHCPA an exemption its text does not contain. Indeed, the New Hampshire Supreme Court has twice noted but declined to resolve the question of whether NHCPA's regulation of "trade or commerce" extends to nonprofit universities. *See Gamble v. Univ. Sys. of N.H.*, 136 N.H. 9, 17 (1992) (assuming without deciding that NHCPA applies to University of New Hampshire system); *Brzica*, 147 N.H. at 452 (noting the limited holding of *Gamble* and conducting transaction-specific inquiry to analyze NHCPA claim against a college).

A federal court applying state law should be reluctant to "create new rules or significantly expand existing rules." *Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007). Recognizing a categorical exemption the state's highest court has declined to adopt would do just that. Under *Brzica*'s transaction-specific inquiry, the plaintiffs have sufficiently alleged conduct within NHCPA's scope: SNHU advertises and sells

---

[57] *Franchi*, on which SNHU relies, does not require a different result, as the NHCPA claim in that case was based on "generalized assurances" made concerning a school's ability to educate a student, not an allegedly knowingly false representation about the school's compliance with a federal privacy statute. 656 F. Supp. 2d at 265-66.

educational services to students in exchange for tuition, and it made the alleged privacy representations to those students in connection with providing those services. That is a business transaction in the course of SNHU's day-to-day business. SNHU's motion to dismiss the NHCPA claim is therefore denied.

### L. Negligence (Count 15)

Lastly, the plaintiffs allege that SNHU negligently disclosed their sensitive personal information, including educational information, to third parties without authorization in breach of its duty to exercise reasonable care in protecting that information. "To state a claim for negligence under New Hampshire law, a plaintiff must allege facts that show the defendant owed him a duty, breached that duty, and that the breach caused the plaintiff harm." *Medeiros v. Town of Rindge*, 671 F. Supp. 3d 96, 100 (D.N.H. 2023). SNHU seeks dismissal of the negligence claim solely on the ground that the plaintiffs otherwise allege that SNHU engaged in intentional misconduct. The plaintiffs respond that they are entitled to plead negligence in the alternative.

The plaintiffs are correct. Federal Rule of Civil Procedure 8(d)(2)–(3) permits parties to plead alternative and even inconsistent theories of liability, including claims premised on negligent and intentional conduct. *See, e.g.*, *Stow v. Comm'r, N.H. Dep't of Corr.*, No. 2025 WL 348185, at *17 (D.N.H. Jan. 6, 2025) (allowing negligence and intentional misconduct claims to proceed). Because SNHU identifies no independent deficiency in the negligence claim, its motion to dismiss that claim is denied.

## IV. Conclusion

For the reasons stated above, the motion to dismiss[58] is GRANTED as to the plaintiffs' claims for violations of the federal Electronic Communications Privacy Act (Count 2), California's Unfair Competition Law (Count 7), and California's Comprehensive Computer Data Access and Fraud Act (Count 8). The motion to dismiss is DENIED in all other respects.

SO ORDERED.

______________________________
Joseph N. Laplante
United States District Judge

Dated: November 25, 2026
Cc: Counsel of record.

[58] Doc. no. 31.